Case 18-2022 Agnieszka Bozik v. Illinois Department of Children and Family Services, Oklahoma Thank you. With the lawyers who are going to actually argue the case, both stand and just give us your names. I'm a personal safety agent here for Delaware County on behalf of the Plans. Good afternoon, I'm Assistant Attorney General Ann Askaris for the Defendant's Appalachian Department and its Director. All right. You each have 20 minutes. Would counsel for the appellant like to save any of that for rebuttal? Yes, please, five minutes. Sure. You do not need to use the whole 20 minutes, but you are free to. Please keep your voices up and you may sit down and you may step up. Thank you. May it please the Court. We are here today because the appellants, Agnieszka and Reza Kozik, have been indicated for child abuse by the DCFS based on an unproven allegation that a burping method caused fractures in the child's knee. Now, for certain allegations of fractures, the DCFS has a specific rule that ordinarily would prevent situations where you have an unproven mechanism of injury. And that specific rule says that both the injury and the likely cause have to be verified by the physician. Now, in this case, there's no dispute that there's no testimony in the record that the burping mechanism described by the plaintiff's caused these fractures. Can we talk about the burp? Where is the fracture? Sorry. What's that? Go right ahead. No, no, no. Is he assembling the carousel to the towel? They're called bucket handle fractures and they're just above and below the knee. Okay. Thank you. Counsel, about the burping method, I believe your client testified that it was something that she saw on the Internet? Correct. Was there any verification of that at all? She could not remember where on the Internet she saw it. I don't know if you have any children yourself, but when you have a newborn and you're trying to figure out whatever you can, at some point she believes that she came across something like a message board or something. Thank you. So there's no dispute that there's no testimony in the record that any physician verified that this burping method was the likely cause of the child's injuries. Does it have to be tied to the burping method, do you think, under the regulations, as opposed to the twisting mechanism that a couple of the doctors did testify to? Why did it have to be tied to the burping method? I think it has to be tied to the burping method because the only evidence in the record is that the burping method is what happened. All this talk about this twisting mechanism, there's nothing in the record that any twisting mechanism was used as part of this burping method. So this is something that what happened was at some point two of the physicians testified that it was inconsistent with the burping method, specifically because it involved a twisting mechanism. And then based on that, the DCFS later said, well, there could have been twisting involved at some point, but that's not anywhere in the record. The plaintiffs never testified to this. The physicians never testified to this. The DCFS caseworker never testified to this. So in my opinion, there's no basis for this court to conclude that there was any twisting mechanism involved in this procedure, that the parents ever used any twisting mechanism. And because of that, I don't think that testimony that a twisting mechanism would have caused this injury in any way fulfills DCFS' obligation to show that the actual burping mechanism is what was the likely cause of the child's injuries. So I think today... What was this burping method? So essentially what they would do is when they were holding the baby, they were trying to get him to burp, and he was having a lot of difficulty with it. And what they would do is straighten his legs out. And, you know, they would gently straighten them out while they were patting his back. And they found that when they straightened the legs out, that opened up the abdominal cavity or what, but somehow they found that that helped the baby burp when, in the past, just patting wasn't doing it. Where does the twisting occur? There isn't. That's the entire point of this is that there's no evidence that there was any twisting involved in the burping mechanism. Nobody said anything about twisting at all until one of the physicians said that what the... would have to involve some sort of twisting. And it's also worth noting that we have another physician who didn't, who testified that it could have been caused by a number of other things. So that's certainly not the only testimony on the record. But that's where this idea of a twisting mechanism first came into the record, despite the fact that it's not actually part of the burping mechanism. So I think that there are two main issues here that I would like to discuss with you this afternoon. And the first is simply that the plain language of the DCFS rule says that you need to have a physician verifying the likely cause of the injury. And what DCFS is arguing is that it's good enough so that the director can basically sort of take on that role and put together their own verification based on other testimony from a physician, rather than having the physician themselves testify to the likely cause. And we believe that the language of the rule is clear. It's a rule that was promulgated by DCFS. It's the rule that they chose to indicate our clients under. This was all their decision, and they should not be able to now say, you know what, we don't really need that, we can just have physicians testify to a bunch of other things, and then kind of cobble together the verification from that. But I understand your argument. It's really not that this medical testimony was insufficient, because the medical doctors did testify as to a likely cause. It's just that that likely cause was never tied back to the parents in any way. Well, yeah, I think that there were. They said this is the cause. This is what we think the likely cause is. Well, yes, two of them said that some sort of twisting mechanism was the likely cause. But yes, what the rule says is that when DCFS says, it has to be an abusive action. So you can't just have some theoretical action. Anyway, DCFS says, this is what we believe caused the injury. This is why we are proceeding with these charges. And in this case, they identified this burping mechanism. And once they do that, they need to have some sort of verification. And they don't have that. Okay, so it's a disconnect between what they found and what the testifies. Correct, correct. It's sort of moving goalposts. It's saying, you know, okay, we can't really show that the action that we've identified caused it, so instead we're just going to try and get verification of something else and then say that that was it when there's no indication that that's what the parents did. Counsel, when you say there were two physicians that testified as to the twisting method being the cause, was that Dr. Kennedy and Dr. Knuth? Dr. Daigle and Dr. Knuth. Dr. Daigle. Yes. Dr. Kennedy never said that. No. Now, as far as Dr. DeCoute, is she an orthopod, orthopedic surgeon? You mean Daigle? Yeah. She's a pediatric orthopedic, correct. Because I wasn't sure from the record if she was orthopedic or not. I believe so. Okay. Because it's interesting in that section of the code they talk about preferably an orthopedist. Actually, you know, I'm not entirely sure. I know that her specialty was, she did a lot of sort of investigations on these. And that's okay. Maybe your co-counsel can get it for me later. But I just wonder because it points out that it must come from a physician and preferably or preferably an orthopedist. Right. And that's where Dr. Sullivan is a piece. No question. Yeah. And I believe Knuth was as well. Yeah. But I don't know about that. Actually, I've been brought up. You've been brought up. Anyway. She's a child abuse pediatrician. Right. So she does not have that specialty. Okay. Thank you. So I think, you know, first and foremost, I think our concern is clarifying this issue because from our standpoint, you know, our clients have spent three years in the court system based on how they birth their child. And we believe that this rule was put in place specifically so that we can avoid situations where you have allegations coming forth without any sort of credible testimony from a physician that the allegations were the cause of it. And we think that this is an opportunity for the court to clarify that when DCFS put their own rule in, saying that you need verification from a physician, that's what they meant. This is the plain language of the rule. And I think that if you allow sort of these other things to be cobbled together, I think that rule ends up becoming pointless. And clearly, DCFS had a reason for including that. And we think it's a very reasonable standard. You know, if you're in civil court and you need causation evidence, you know, you have to have a physician or, you know, an expert testify to a reasonable degree of medical certainty or whatever their expertise is. And we think it's completely reasonable to expect DCFS, when they're talking to the physician, to simply say, is this, you know, these allegations here, is that the likely cause of the injury? And that simply did not happen here, and we think that that's an important safeguard that the DCFS intended, and that that should be upheld. Now, beyond that, I think even if you want to, you know, DCFS argued, as I said before, that you can basically infer, that the director can infer based on physician's testimony what the likely cause is. We think even if you want to take that approach, which obviously we don't agree with, in this situation you don't even have that. Because ultimately what you have are you have two physicians who both said it's not the likely cause because the likely cause would involve some sort of twisting mechanism. And then you have the third physician, Dr. Sullivan, who said basically anything could have caused this. And certainly saying that there are all sorts of causes, including, he specifically testified, accidental means, when you have that testimony on the record, I don't think there's any way that you can take that testimony and somehow conclude from that that this twisting mechanism was the likely cause. Can we just talk for a minute about non-accidental means? Sure. What do you think that means? Because you also argued that they hadn't shown that it was non-accidental means. And what does that mean? You don't need to show specific intent. What does the department need to show to show it's non-accidental? I think from my perspective, I think if they want to show that it's non-accidental, they have to show that it was an action with, even if the intent wasn't necessarily, I would argue that you need to have some sort of action that was intended to cause whatever the physical outcome was. So, for example, there's case law where a woman was trying to restrain a child, and the child fell on a pencil. And they said that even if the intent was trying to restrain the child, they weren't trying to make the ball a pencil. Yeah, yeah. Because it's unlikely. It's an unlikely outcome. Exactly. And certainly in a situation like this, there's no reason. We're not talking about a parent who did something clearly reckless, who was frustrated, did something out of anger, anything like this. It's simply they were just trying to hurt their kid. Right. It doesn't seem like a likely outcome of hurting your child. Correct, correct. And again, I think that that's why the DCFS has set this very reasonable standard that you need to have a physician testifying as to the causes. Because otherwise you can have all sorts of completely benign actions that next thing you know are, you know, arguing in front of you in situations just like this because, you know, DCFS now has to kind of reach for whatever explanation they can find. Do you have a cite for that pencil case? Or if not, you can give it to me out of rebuttal. Why don't you use the rest of your time? Sure, sure. Thank you. Thank you. Counsel, with the burping method, was there ever testimony that there was any injury to the other leg? There actually was a fracture in the other leg as well. That's correct. Continue. So, again, going back to the issue of if you allow for the director to sort of cobble together their own verification through testimony, I think there's a really important distinction to be made. There's a case that I probably cite called Bolger where, you know, in the Bolger case, they did allow this sort of, did the director kind of reach his own conclusion? That's the medical neglect case. Correct, correct. And I think, you know, first of all, that's a second district opinion that I don't think should be followed here for the reasons I've already discussed. But beyond that, I think that there's a really important distinction with Bolger, and that is in the Bolger, so first of all, there's a different standard in Bolger because, like you said, it was an neglect case, not an abuse case, and they had to show that there was, you know, some sort of verification that this burn, if untreated, would have led to some, you know, to an injury. And in that situation, you had physicians who testified, one physician in particular who testified that, well, I had to treat it because otherwise it would have gotten infected. And so, you know, the issue there was more of a do you have to use these special, you know, magic words that are in the statute in order to verify, in this case, that the injury would have led to, or that lack of treatment would have led to injury. And there you basically, you know, you had a physician saying so much but just not saying it in those words. And I think it's a very different situation than the current one where you have three physicians who all had the opportunity to say this was a likely cause, and none of them were able to do so. If you want to say five minutes, you're out of time. All right. Thank you, Your Honor. Unless either of you have questions. I'll get on the phone. You'll get it when he comes back. Yes. Oh, yeah.  The parents claim that verification of the injury and the likely cause by a doctor is a procedural hearing requirement. The allegation of harm number nine requires that a doctor must parent its language and verify the likely cause of the injury in order for the director to determine abuse by bone fractures. They're wrong. That provision of allegation of harm number nine isn't a procedural hearing requirement. That, in conjunction with Section 3 of the Act, is the legal standard, the department's definition and legal standard of bone fractures by abuse. The director draws the ultimate conclusion, whether this legal standard was met from all of the evidence presented during the hearing and the factual findings that he makes. These are the results of a fact-finding proceeding applied to a legal standard, and this happens both within administrative review proceedings and outside of administrative review. The witnesses here, the doctors, do not have to testify in terms of the legal standard and do not conclude whether the legal standard was met. That's the job of the director here, the decision-maker. Bolger confirms that this provision is part of the legal standard and not a procedural hearing requirement. That court recognized that there is a legal standard. The provision of the Act, combined with the relevant allegation of harm, to which the director applies the facts. In that case, it's correct. The allegation of harm was medical neglect, which required certain things be verified by a physician, as does the allegation of harm here. That court confirmed that no one treating physician had to so specifically testify and parrot the language of the regulation. Counsel, can you define for me a procedural hearing requirement? What is that? Right. It's what I'm characterizing what the parents are saying that they need to say. What you're saying is this section of your code, section 300, appendix B, allegation 9, right? Right. It's a procedural administrative hearing requirement. No, I'm not saying that. I'm saying that's what the parents are saying it is. That they're saying it's a procedural hearing requirement requiring that a doctor parrot the language of the regulation. I'm saying that that's the legal standard for abuse that's been defined by the department. It's the law that after the fact-finding, the director has to apply the facts, as he found, from all of the evidence that was presented and considered to the legal standard in making a determination as to whether the legal standard was satisfied. Okay. Where do we go from here? How does that help you? How does that change things? Well, according to the parents, no one doctor had to specifically testify that the burping method was the likely cause of the injury. Instead, what the parents take issue with on that end would be the director's determination that based upon the evidence presented, he couldn't have made the determination he did, that the legal standard was met. There was enough evidence here to satisfy the standard, and the director's determination is not clearly erroneous. First, I'd like to point out the likely cause of the injury standard. The department didn't require a definite cause, he said, or a certain cause, and that makes sense. The doctors didn't witness the occurrence of the injury. They're treating physicians who treated the child who was brought to the hospital with multiple fractures of both legs and different bones at different stages of healing. What is the likely cause, then? Define that for me. I'm sorry? What is the likely cause? What do we conclude? What is that? Miriam Webster defines likely as probable or probably, so that's one plain English definition to look at that. But here, the evidence considered as a whole, including the three doctors who testified about the mechanism or causation of the injury and the burping technique while ruling out other causes, and the parents admitting to doing something that could have caused the multiple fractures in the baby's legs. What do they say? What was the testimony from the mother or father that said anything other than what your opponent said about pulling gently on the baby's legs? If I could go through the testimony, I'd like to go through the parent's testimony and the doctor's specific testimony on causation and then the burping method. And I think that would, because I do think the director looks at all the evidence. The parents said that they were the baby's only caretakers. He was two months old. You're talking about the actual? Yeah. They testified their description of the burping technique was that they lightly pulled down on both legs at the same time to keep them straight until the baby burped. The baby always cried during burping for a one-month period. And it's correct that they found the burping technique on the Internet. That's what they testified to. They did not provide evidence of it. They did not provide what the directions were to determine whether they correctly followed those directions. They did not provide if there were any side effects noted in utilizing the burping technique. Doctors Knuth and DeKill confirmed that there were multiple fractures in both legs at different stages of healing that were forceful, inflicted injuries and non-accidental trauma. They eliminated self-infliction as a cause. They eliminated genetic disorders as a cause. They eliminated metabolic disorders as a cause. Three doctors gave the type of testimony contemplated by the regulation regarding the mechanism and cause of the injury. I'll start with Dr. Let me ask you this. Do you agree that what your opposing counsel demonstrated to be the burping technique, do you agree that he correctly demonstrated for the court that burping technique? Did you see how he demonstrated it to us? I was sitting behind him so I couldn't quite see. I know what... Do you think it was an accurate representation? All I know is what the parent said was that... No, I'm asking you, did he give us an accurate demonstration of the burping technique? I was sitting behind him so I couldn't see what you were saying. Was there anything about what you could observe in his demonstration that indicated to you he was using a forceful technique in adjusting the legs of this baby? Whether it was testified to or whether he represented it. What she showed us, to me, appeared to be a non-forceful action. Okay. Would you agree with that? State it another way. What about his demonstration indicated that a forceful action was taken? Well, I didn't see anything that I personally would consider forceful about that. Sitting from behind him and not being the decision maker in the case, though, I will say that Dr. Sullivan, who the plaintiffs sought out six weeks after the baby's discharge from the hospital on the advice of their attorney, testified that a likely mechanism of the injury would be a hyperextension of the baby's knee. He was then questioned about the burping technique. He twice confirmed that the action of pulling on the leg or knee could cause a hyperextension resulting in the fractures he saw. And he said even if the baby's leg was gently straightened, gently straightened, that could possibly cause the fractures if the knees were hyperextended or overextended. Okay, so let's talk about that. Let's assume that. Because that one you could tie to the parents how they described the burping practice. Yes. And if that's the basis for the administrative finding, how is that non-accidental? Because it has to be a non-accidental means. And they purposely, they did not by accident use the burping method. Okay, if I can't feed my child something that the child's allergic to and they get violently ill, but I have no reason to know that, that's accidental, isn't it? I very deliberately fed my child applesauce. Violently ill. Sounds accidental to me. Well, there was evidence that tied the burping method to the injury. I understand that. Was there any evidence that suggested the parents had any reason to believe that the burping method was injuring their child? The statute and the regulation doesn't require intent to harm. Can you answer my question? Was there any evidence that the parents had any reason to believe that this was harming their child? Well, he cried all the time when they did it. He moved only one leg at a time when he went to the hospital with a swollen leg. He could not move that leg. The doctors described that as pseudoparalysis. The mom then told the doctor, oh, prior to this he only moved the right leg. The right leg is the one that the x-ray showed had a healing fracture. So I don't think that it has to be that the parents recognized that harm was imposed, but the child went to the emergency room with multiple fractures in both legs. But the parents took him to, correct? Yeah, they did. They did. I would also like to point out that it is true that Drs. Knuth and DeKeele described the mechanism of the injuries as being consistent with traction, either a pulling or pushing and a twisting. And when Dr. DeKeele, who was a pediatrician but not an orthopedic specialist, she was a child abuse specialist at the hospital, she said it's possible that the broken technique employed by the parents could have caused the fractures if it resulted in a forceful fighting mechanism. And again, Dr. Sullivan said the injury could result if the baby struggles or twists against resistance. Now, the parents here, this is important, neither parent testified that the baby did not twist, that the baby did not resist, that the baby did not struggle, or that the baby did not hyperextend his knees when they pulled his legs down and held him that way to burp him. And so the director could certainly make a negative inference on the evidence. Were they asked those specific questions? I don't believe their attorney did ask them questions. Well, did anyone in class ask them those questions? I don't believe anyone did. But what I'm saying is that this evidence considered as a whole, the doctors weren't there when the injuries were caused, the parents were the sole caretakers, the baby can't talk. Can I understand what you're saying, what they didn't testify to? Well, if they weren't given an opportunity or somebody didn't ask that question. There was a three-day administrative hearing. With the burden on the department at that hearing, correct? To prove by a pre-conduct of the evidence, but there was no evidence saying that none of this happened. Jumping back, I just want to confirm that Volger controls here as to the testimony. That court specifically stated that no doctor needed to specifically testify because they impaired the language of the regulation and that no doctor there specifically acknowledged or specifically testified in the words of that regulation. And that is the case here. No physician needed to so specifically testify that the parent's burping method was the likely cause of the child's broken bones for this court to affirm the director. The decision maker conducted a three-day administrative hearing. The decision maker considers all of the evidence, makes factual findings, and applies it to the law. And that's what occurred here. Can I ask you about Volger? That interpreted a different section, though, did it not? Right. It was a medical neglect allegation. It was still a department allegation of harm, but it required the same thing, verification from a physician of certain things. Again, it's a different section, and it doesn't say likely cause in that section? It doesn't say likely cause, but it required, quote, if untreated a health problem could become severe enough to constitute or result in serious or long-term harm to the child as verified by a physician and no physician testified about that. My question was that it's referred to likely cause. No, it did not. Correct. That wasn't part of that. I understand that. So to the extent that that's how Volger is distinguishable, but what Volger stands for is that these are legal standards, the act combined with the allegation of harm. That's the legal standard. I understand how you think that works. I'm just saying, they did not use that term. They didn't. That term is very important in this case. They didn't use likely cause. Right. Okay. Thank you. With that, I would ask that on this record, the court of the drafter did not clearly err in determining that the likely cause of the child's multiple bone fractures inflicted by non-accidental means was the parent's burping method. I would ask that the court affirm the circuit court's judgment upholding the drafter's final administrative decision. Thank you, counsel. Thank you. Any questions? No. Thank you. Do you have my pencil case? I do. Yeah, of course. The case is a sort of VDCFS 953ME2D44. For a second, I thought you meant like a literal pencil case. So, your honors, I think, first of all, I think a lot of the questions that you asked my counterpart with the DCFS highlights why it's important to have this verification in the first place and why I think the DCFS made this rule. There are a lot of questions that, frankly, I'm not sure any of us are well suited to determine that a physician would be perfect to rule on. And I think if they had just asked somebody at the hearing, was the burping mechanism the likely cause of this injury, and they said yes or no, that would have obviated pretty much this entire hearing. I think that that's the main point that I want to hammer home here is that that's the reason that DCFS is asking for verification from a physician who knows the case, who knows the science, who can put all that together instead of leaving a bunch of lawyers to try to sift through this and reach their own conclusion. Now, that being said, I think I just want to reiterate the standard here, which is clearly erroneous. And the definition for clearly erroneous is that you are left with a definite and firm conviction that a mistake has been committed. And I think that what we're seeing here is that we still don't have any, we still have somebody with two parents with no indication of any other history of abuse or any problems, anything, who are facing 20 years, are currently on a state central register for 20 years because of a burping mechanism that nobody could testify actually caused the injury. And I think that this is a textbook example of where a mistake has been committed. And I think that it's important to be reminded of what the ALJ's conclusion was, which we indicated in our opening brief on page 12, which was that the whole basis for indicating the claims was, quote, it is more likely than not that the fractures were caused by the appellant's abusive use of a purported burping method rather than incidental or accidental in the course of administering typical parental care, and therefore, according to the evidence, supports the indicated finding against both appellants in this case. And simply put, we don't have any evidence tying the burping method to the injury. And I think that that is why we're here today, and that's what's clearly erroneous. And I think one other thing I want to point out is, since you discussed Dr. Sullivan's testimony a bit, and in the defendant's brief, one of the issues here is that she mentioned several times that while they were in the parent's care, this happened, what else could it have been? And the reality is that Dr. Sullivan testified that there were all sorts of things that could have, all sorts of accidental means that could have caused this. So it's not a situation of a differential diagnosis or anything like that. But what's telling in the brief is that at one point, they mentioned that Dr. Sullivan said that this hyperextension could happen during normal handling, but they dismiss it because they say, quote, he acknowledged that an injury from putting clothes on is, quote, not really common. Now, two pages later, they quote, that's on page 16. So they dismiss the accidental illustrations because he said it was not very common. But on page 18, they quote Dr. Sullivan regarding the burping method. And there, Dr. Sullivan's answer, you see the Q and the A on top of the page on page 18, the answer is, well, quote, normally it doesn't cause it. So when we're talking about accidental means, and Dr. Sullivan says it doesn't normally happen, they want to dismiss those accidental means, but when he says that this burping method also would normally cause it, they think that that's sufficient to prove causation. And I think that shows the disconnect right here and the reason that it's important to have a physician's verification. Now, beyond that, I think that it's, you know, at the end of the day, we need to remember that, you know, the burping improves on the DCFS. And when you hear DCFS counsel saying, well, nobody asked if it wasn't a twisting mechanism, I think that shows the problem of this case overall, which is essentially what we have is we don't have a good answer. DCFS never had a good answer. The only thing that they could come up with was this burping method came up. And they said, you know what, this is all we have to go with, so this is what we're going to do. And throughout that entire time, you heard time and time again testimony that, you know, there was some sort of injury or some sort of, you know, something that wasn't consistent with the burping method, but that could be tied to the injury. So I guess we'll just sort of read that into the burping method, even though it's not there. Because ultimately, we just, we don't know what happened. And the DCFS rules are clear that in order to put somebody on a state counselor to serve for 20 years, you need to have a physician saying it's the likely cause. And we simply don't have that. And I think that it's important for this court to clarify to future ALJs and future hearings and everything else that that's a rule for a reason, and that it needs to be respected and it needs to be adhered to. So with that in mind, I ask that you uphold the appellant's appeal and expunge their indicated findings and remove them from the state central registry. Thank you. Thank you. Thank you, counsel. I believe that this court is in recess. Thank you.